**THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | | |
|---|---|---|
| STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, and STATE FARM FIRE AND CASUALTY COMPANY, | ) ) ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. |
| RONALD JACK TRAVIS UTTER, D.C., NO UTTER WAY, INC. (formerly d/b/a Ocoee Chiropractic & Injury Center and now d/b/a Preferred Injury Physicians of Orlando), HALIFAX CHIROPRACTIC & INJURY CLINIC, INC. (now d/b/a Preferred Injury Physicians of Daytona Beach), PREFERRED INJURY PHYSICIANS OF BRANDON INC., PREFERRED INJURY PHYSICIANS OF KISSIMMEE, INC., PREFERRED INJURY PHYSICIANS OF ORANGE CITY INC. (now d/b/a Preferred Injury Physicians of Deltona), PREFERRED INJURY PHYSICIANS OF TOWN & COUNTRY INC. (now d/b/a Preferred Injury Physicians of Tampa), PREFERRED INJURY PHYSICIANS OF WESLEY CHAPEL, INC., and PREFERRED INJURY PHYSICIANS OF EAST ORLANDO, INC., | ) ) ) ) ) ) ) ) ) ) ) | **CIVIL ACTION** **JURY DEMAND** |
| Defendants. | ) | |

**COMPLAINT**

1

Plaintiffs, State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company (hereinafter referred to individually as "State Farm Mutual" and "State Farm Fire" or collectively as "Plaintiffs"), by and through their counsel, bring this action against Ronald Travis Jack Utter, D.C. ("Dr. Utter"); No Utter Way, Inc., formerly d/b/a Ocoee Chiropractic & Injury Center and now d/b/a Preferred Injury Physicians of Orlando ("No Utter Way"); Halifax Chiropractic & Injury Clinic, Inc., now d/b/a  Preferred Injury Physicians of Daytona Beach ("Halifax"); Preferred Injury Physicians of Brandon Inc. ("PIP of Brandon"); Preferred Injury Physicians of Kissimmee, Inc. ("PIP of Kissimmee"); Preferred Injury Physicians of Orange City Inc., now d/b/a Preferred Injury Physicians of Deltona ("PIP of Orange City"); Preferred Injury Physicians of Town & Country Inc., now d/b/a Preferred Injury Physicians of Tampa ("PIP of Town & Country"); Preferred Injury Physicians of Wesley Chapel, Inc. ("PIP of Wesley Chapel"); and Preferred Injury Physicians of East Orlando, Inc. ("PIP of East Orlando") (collectively "Defendants"), and allege causes of action of common law fraud, unjust enrichment, and violations of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA").  Plaintiffs also seek relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§2201 and 2202.  In support of these claims, Plaintiffs allege as follows:

## I.      NATURE OF THE ACTION

1.      This action involves a fraudulent scheme by Defendants to obtain money from State Farm Mutual and State Farm Fire by submitting, or causing to be submitted, bills and supporting documentation that are fraudulent for services purportedly provided to individuals ("patients") who have been in automobile accidents and are eligible for Personal Injury Projection benefits ("PIP Benefits"), and in some instances, Medical Payments Coverage benefits ("MPC Benefits"), under State Farm Mutual and State Farm Fire policies when in fact the services are not performed

because they are medically necessary or are not performed as represented in the bills and supporting documentation. Instead, the services are performed, if performed at all, pursuant to a predetermined treatment protocol (the "Predetermined Protocol") designed and carried out to enrich Defendants by exploiting patients' eligibility for PIP Benefits, and not to address individual patients' unique circumstances and needs.

2.      The Predetermined Protocol, as created and implemented by Dr. Utter and carried out by Dr. Utter and the staff at each Defendant clinic under Dr. Utter's direction and control, includes: (a) failing to legitimately evaluate patients to determine the true nature and extent of their injuries; (b) failing to arrive at a legitimate treatment plan to address patients' true needs; (c) securing Emergency Medical Condition ("EMC") determinations from selected outside providers paid by Defendants that allow Defendants to access the full limits of patients' PIP coverage; (d) reporting the same or similar examination findings for patients to justify a predetermined, non-individualized course of treatment, including the modalities administered during care and the durable medical equipment ("DME") dispensed, which is materially the same for most patients regardless of other factors including any prior course of care administered to the patient for the same injury or other relevant preexisting medical and physical conditions patients may have had before presenting to the Defendant clinics; (e) implementing the Predetermined Protocol, designed to ensure the Defendant clinics bill between five and eight modalities on each patient encounter, with five particular passive modalities (spinal chiropractic manipulation, manual therapy, mechanical traction, hot/cold packs and electric stimulation) administered on the majority of patient visits, regardless of patients' unique circumstances and needs; (f) submitting documentation to State Farm Mutual and State Farm Fire falsely representing the evaluations and treatment purportedly provided to patients were legitimately performed and medically necessary when, in fact, they were

provided pursuant to the Predetermined Protocol, not to address the patients' unique circumstances and needs; and (g) submitting documentation to State Farm Mutual and State Farm Fire falsely representing that services were provided to patients when they were not.

3.     The Predetermined Protocol is not designed to legitimately examine, diagnose, and treat patients. Rather, it is designed and carried out at each of the Defendant clinics to enable Defendants to fully exploit and collect patients' PIP Benefits, which, after securing an EMC determination, are typically $10,000. For those patients who are entitled to make a claim for MPC Benefits, this exposes an additional $5,000 in coverage for the Defendant clinics to recover from patients for medical expenses incurred in excess of their PIP coverage limits.

4.     Accordingly, because the above-described services were performed, if at all, pursuant to the Predetermined Protocol, and Defendants engaged in the other fraudulent conduct described herein, the bills and supporting documentation submitted to State Farm Mutual and State Farm Fire for those services, described, in part, in the charts attached hereto as **Exhibits A (Initial Evaluation Notes Survey Chart), and B (Treatment by Date of Service Chart)**, are fraudulent and the charges for those services are not owed.

5.     Defendants have made material misrepresentations to conceal their fraud from State Farm Mutual and State Farm Fire. The bills and supporting documentation for each patient, when viewed in isolation, do not reveal their fraudulent nature. Only when the bills and supporting documentation across all claims at issue are viewed together do the patterns emerge revealing the fraudulent nature of all the bills and supporting documentation.

6.     Defendants' fraudulent scheme began as early as 2018 and has continued uninterrupted since that time. As a direct and proximate cause of the scheme, Plaintiffs have incurred damages of at least $3.3 million in PIP Benefits and MPC Benefits paid to Defendants.

7.     This action asserts common law and statutory causes of action for fraud and unjust enrichment and a statutory claim for deceptive and unfair trade practices pursuant to § 501.211(4)(a), Fla. Stat. This action also seeks a declaratory judgment that Plaintiffs are not liable for any pending unpaid bills submitted by or on behalf of the Defendant clinics to date and through the trial of this case based upon the above-described conduct.

## II.     JURISDICTION AND VENUE

8.     Pursuant to 28 U.S.C. §1332(a)(1), this Court has jurisdiction over all claims because the matters in controversy exceed the sum or value of $75,000, exclusive of costs and interest, and are between citizens of different states.

9.     Pursuant to 28 U.S.C. §1391(a), venue is proper in this district because this is the jurisdiction where a substantial part of the events or omissions that gave rise to the claims occurred.

## III.     PARTIES

### A.     Plaintiffs

10.    State Farm Mutual and State Farm Fire are each a citizen of Illinois. Plaintiffs are corporations existing under the laws of the State of Illinois, with their principal place of business in Bloomington, IL. At all relevant times, Plaintiffs were licensed in Florida to engage in the business of insurance.

### B.     Defendants

11.    Defendant Dr. Utter, a licensed chiropractor, is an adult individual who, since April 2013, was, and continues to be, a proprietor, owner, officer, employee, agent, and/or shareholder/member of each of the Defendant clinics. Dr. Utter resides and is domiciled in and is a citizen of the State of Florida.

12.     Defendant No Utter Way, formerly doing business as Ocoee Chiropractic & Injury Clinic and now doing business as PIP of Orlando, is a Florida Profit Corporation with its principal place of business located at 109 Terra Mango Loop, Suite B, Orlando, FL 32835. This corporation is a citizen of the State of Florida.

13.     Defendant Halifax, now doing business as PIP of Daytona Beach, is a Florida Profit Corporation with its principal place of business located at 337 North Clyde Morris Boulevard, Daytona Beach, FL 32114. This corporation is a citizen of the State of Florida.

14.     Defendant PIP of Brandon is a Florida Profit Corporation with a principal place of business located at 1335 Oakfield Drive, Brandon, FL 33511. This corporation is a citizen of the State of Florida.

15.     Defendant PIP of Kissimmee is a Florida Profit Corporation with a principal place of business located at 207 West Cypress Street, Kissimmee, FL 34741. This corporation is a citizen of the State of Florida.

16.     Defendant PIP of Orange City is now doing business as Preferred Injury Physicians of Deltona. It is a Florida Profit Corporation with a principal place of business located at 2922 Howland Boulevard, Suite 2, Deltona, FL 32725. Its former principal place of business was located at 2705 Rebecca Lane, Suite A, Orange City, FL 32763. This corporation is a citizen of the State of Florida.

17.     Defendant PIP of Town & Country, now doing business as Preferred Injury Physicians of Tampa, is a Florida Profit Corporation created with a principal place of business located at 5411 Beaumont Center Boulevard, Suite 785, Tampa, FL 33634. This corporation is a citizen of the State of Florida.

18.     Defendant PIP of Wesley Chapel is a Florida Profit Corporation created with a principal place of business located at 3743 Maryweather Lane, Wesley Chapel, FL 33544. This corporation is a citizen of the State of Florida.

19.     Defendant PIP of East Orlando is a Florida Profit Corporation created with a principal place of business located at 1417 North Semoran Boulevard #108, East Orlando, FL 32807. This corporation is a citizen of the State of Florida.

## IV.     ALLEGATIONS COMMON TO ALL COUNTS

### A.     Florida's Personal Injury Protection/No-Fault Insurance Payment Statutes

20.     Pursuant to the Motor Vehicle No-Fault Law, §§ 627.730 – 627.7405, Fla. Stat. (the "No-Fault Law"), Florida has established a no-fault system to provide for the timely payment of medical bills to allow victims of automobile accidents quick access to medical care for their injuries without a determination of fault, and to also reimburse a portion of their lost wages. These statutory provisions require automobile insurers to provide PIP coverage to their insureds, who are in turn required to purchase PIP coverage. §§ 627.733 and 627.736(1), Fla. Stat.

21.     An insurer is required to issue reimbursement to healthcare providers at a rate of 80% of all reasonable expenses for medically necessary, related, lawfully rendered, and properly billed medical, rehabilitative and certain other goods and services provided an insured presents for medical care within fourteen (14) days of an automobile accident. § 627.736(1)(a) and (5)(a), Fla. Stat.

22.     Florida residents may also purchase voluntary MPC coverage, which, if selected, covers the 20% co-pay for medical expenses that are reimbursable at 80% of the charges with PIP benefits under § 627.736, Fla. Stat. MPC Benefits provide for an additional in $5,000 in coverage for

medical expenses which are in excess of an insured's PIP Benefits and may be paid once the latter are exhausted.

23.     For purposes of determining the compensability of medical treatment with PIP benefits, "medically necessary" refers to a:

> medical service or supply that a prudent physician would provide for the purpose of preventing, diagnosing, or treating an illness, injury, disease, or symptom in a manner that is:
>
> (a)  In accordance with generally accepted standards of medical practice;
> (b)  Clinically appropriate in terms of type, frequency, extent, site, and duration; and
> (c)  Not primarily for the convenience of the patient, physician, or other health care provider.

§ 627.732(2), Fla. Stat.

24.     The available PIP coverage limits for medically necessary services are $2,500 unless a properly licensed doctor, physician assistant or advanced practice registered nurse determines the injured claimant suffered an emergency medical condition ("EMC") as the result of an automobile accident requiring those medical services. § 627.736(1)(a)3., Fla. Stat.

25.     Where a determination was made that an injured claimant suffered an EMC as a result of an automobile accident, the available PIP limits are increased to $10,000. § 627.736(1)(a)3., Fla. Stat.

26.     Plaintiffs, as automobile insurers complying with Florida's No-Fault law, need not reimburse a healthcare provider from an insured's PIP Benefits if the provider does not comply with all applicable statutory and regulatory requirements governing the provision of those goods and services. Specifically, an insurer is not required to reimburse claims or charges related to goods or services or treatment that were not lawful at the time they were rendered, or to any person who "knowingly" (as expressly defined in § 627.732(10), Fla. Stat.) submits a false or misleading

statement related to the claims or charges for medical treatment. § 627.736(5)(b)1.b. and c., Fla. Stat.

27.     A healthcare provider must submit bills requesting payment of PIP benefits for medical services on a "properly completed" (as expressly defined in § 627.732(13), Fla. Stat.) Centers for Medicare and Medicaid Services or Health Insurance Claim Form-1500 ("CMS-1500") that "compl[ies] with the CMS 1500 form instructions, the American Medical Association CPT Editorial Panel, and the Healthcare Common Procedure Coding System (HCPCS); and must follow the Physicians' Current Procedural Terminology (CPT), [and] the HCPCS in effect for the year in which services are rendered...". § 627.736(5)(d), Fla. Stat.

28.     A PIP insurer is deemed to have not received notice of any bill for medical services that does not comply with the requirements of § 627.736(5)(d), Fla. Stat., such that the charges set forth in any such bill cannot become due or overdue.

29.     Similar to Florida's No-Fault Law, pursuant to applicable State Farm Mutual and State Farm Fire policies, an insured's optional MPC coverage is only available for treatment that is medically necessary and lawfully rendered.

30.     Defendants' scheme is designed to exploit patients' available PIP Benefits, and MPC Benefits where an insured has purchased the additional coverage, by exhausting, or substantially reducing, the amount of available benefits.

### B.     Pertinent Law Governing Fraudulent Claim Submissions in Florida

31.     A healthcare provider acts "knowingly" when it has "actual knowledge of the information; acts in deliberate ignorance of the truth or falsity of the information; or acts in reckless disregard of the information." Proof of specific intent to defraud is not required. § 627.732(10), Fla. Stat.

32.     An insurer is permitted to deny a claim submission when a healthcare provider has failed to comply with the dictates of § 627.736(5)(b)1.c., Fla. Stat. This extends to situations where the healthcare provider has committed a fraudulent act related to the provision of care and/or submission of a specific charge and those where the provider submits billing for any treatment service purportedly performed but which is not supported by the accompanying treatment records. The false or misleading submissions regarding services allegedly provided to insureds invalidates the entirety of the healthcare provider's claims for services provided to the insureds and relieves the insurer of any requirement, duty or obligation to pay any of the charges contained within those claims.

### C.     Florida's Insurance Fraud Statute, Fla. Stat. §817.234

33.     Florida's Insurance Fraud Statute broadly prohibits false or fraudulent insurance claims.

34.     Specifically, the Insurance Fraud Statute states that a person commits insurance fraud if that person "with the intent to injure, defraud, or deceive any insurer: 1. [p]resents or causes to be presented any written or oral statement as part of, or in support of, a claim for payment or other benefit pursuant to an insurance policy or a health maintenance organization subscriber or provider contract, knowing that such statement contains any false, incomplete, or misleading information concerning any fact or thing material to such claim." *See* § 817.234(1)(a)1., Fla. Stat.

35.     The term "statement" is defined to include, but is not limited to, "any notice, statement, proof of loss, bill of lading, invoice, account, estimate of property damages, bill for services, diagnosis, prescription, hospital or doctor records, x-ray, test result, or other evidence of loss, injury, or expense." § 817.234(6), Fla. Stat.

36.     A violation of Florida's Insurance Fraud Statute constitutes a *per se* violation of FDUTPA, § 501.203(3)(c), Fla. Stat., as set forth in more detail below.

### D.      The Legitimate Treatment of Patients with Sprains and Strains

37.    Defendants purport to evaluate and treat patients who have been in automobile accidents and complain of neck and/or back pain, among other symptoms.

38.    For patients who have been in auto accidents and have legitimate complaints of neck and/or back pain, or other ailments, a provider must obtain a detailed history and perform a legitimate physical examination to arrive at a legitimate diagnosis unique to that patient's condition.

39.    Based upon that legitimate diagnosis, a licensed professional must engage in medical decision-making to design a treatment plan tailored to the patient's unique circumstances. During the course of treatment, a licensed professional should modify the treatment plan based upon the patient's unique circumstances and the patient's response (or lack thereof) to the treatment provided.

40.    Legitimate treatment plans for patients who suffered soft tissue injuries such as strains or sprains may involve no treatment at all because many of these kinds of injuries resolve without any intervention, or may require a variety of interventions, including medications to reduce inflammation and relieve pain, passive modalities, active modalities, DME, diagnostic testing, or referrals to other providers.

41.    Passive modalities do not require a patient's affirmative effort or movement. Many kinds of passive modalities may be utilized by a licensed professional, including hot and cold packs, ultrasound, electrical stimulation, chiropractic manipulation, traction, manual therapy, and massage.

42.    Active modalities require a patient's affirmative movement and include a wide variety of exercises, strengthening, and stretching tailored to a patient's unique circumstances, including the

nature and location of the injuries, the patient's physical abilities, and the patient's response (or lack thereof) to any particular active modality on any day or over time.

43.     In legitimate treatment plans, passive modalities are typically used only to the extent necessary to reduce pain and facilitate the patient's ability to engage in active modalities, and active modalities are introduced as soon as practicable to promote the resolution of symptoms. Therefore, while one or more passive modalities may be medically necessary on any particular visit to reduce pain and facilitate the patient's ability to perform active modalities, the combination of five or more passive modalities on nearly every visit, and especially after active modalities are introduced into the patient's treatment regimen, would rarely, if ever, be appropriate for any patient, let alone for virtually every patient.

44.     The decision of which, if any, types of treatment are appropriate for each patient, as well as the level, frequency and duration of the various services, should vary depending on a patient's unique circumstances, including: (a) the patient's age, social, family and medical history; (b) the patient's physical condition, limitations and abilities; (c) the location, nature and severity of the patient's injuries and symptoms; and (d) the patient's response to treatment (or lack thereof).

45.     Treatment plans should be periodically reassessed and modified (or discontinued) based upon a patient's progress (or lack thereof.) To the extent diagnostic tests such as x-rays and magnetic resonance imaging studies ("MRIs") are medically necessary and are performed, such orders should by supported in the treatment record by the patient's subjective complaints and clinical exam findings. The results should be integrated into patients' diagnoses and treatment plans, with adjustments made to ongoing treatment and consideration of, as appropriate to those findings, referrals to specialists for continued care.

46.     Patients should be discharged from treatment when they have reached maximum medical improvement ("MMI"), such that no further treatment is likely to benefit the patient.

47.     The above-described process of evaluation, diagnosis and treatment must be appropriately documented for the benefit of: (a) the licensed professionals involved in the patient's care; (b) other licensed professionals who may treat the patient contemporaneously or subsequently; (c) the patient, whose care and condition necessarily depends on the documentation of this information; and (d) payors such as State Farm Mutual and State Farm Fire, so that they can pay for reasonable and necessary treatment.

48.     As described below, Defendants do not legitimately evaluate or treat their patients for their unique conditions and needs. Instead, Defendants subject their patients to the Predetermined Protocol, through which patients receive virtually the same laundry list of services on every visit to exploit their PIP Benefits, and, where available, MPC Benefits, which enriches Defendants rather than addressing patients' unique conditions and needs.

49.     In addition to the predetermined course of care purportedly rendered to each patient, the documentation associated with Defendants' purported evaluation and treatment of those patients show pervasive and implausible patterns. Defendants have submitted, or cause to be submitted, this documentation to Plaintiffs in support of bills for services purportedly provided to patients. The documentation is not credible and is fraudulent because it reflects services that were either not performed or performed pursuant to the Predetermined Protocol, not because such services were medically necessary to address patients' unique conditions and needs.

50.     Further, Defendants rarely, if ever, issue orders for their patients to undergo x-ray testing, whether performed in-house or at an outside facility. Instead, they proceed directly to ordering and having patients undergo costly and medically unnecessary MRI testing.

13

### E.     The Legitimate Billing of Chiropractic and Therapeutic Services

51.     It is the duty of the licensed professional to submit billing accurately reflecting the services actually provided to the patient.

52.     Proper billing practices require the licensed professional to select the appropriate CPT code accurately describing the chiropractic, therapeutic, or medical service provided and identifying the correct ICD-9 or ICD-10 diagnosis code treated with that service on each visit date. The CPT codes, as established by the American Medical Association and set forth in the CPT Guidelines, have been designated by the Department of Health and Human Services as the national coding standard for billing of services rendered by healthcare providers under the Health Insurance Portability and Accountability Act ("HIPAA").

53.     Florida's PIP law requires the licensed professional to utilize correct CPT codes in its billing submissions on each visit. § 627.736(5)(d), Fla. Stat.

54.     Use of the CPT codes is required for all electronically submitted health care transactions, such as bills submitted to an automobile insurance carrier for reimbursement under an individual's PIP coverage, and, where available, MPC coverage, and which bills are submitted using the CMS-1500 form.

55.     Each service described and billed on a CMS-1500 form by the licensed practitioner is an attestation that the services listed on the bill conform to the unique services described by that CPT code, that the corresponding services were actually provided, and that those services were medically necessary and reasonable.

56.     As described below, under the direction and control of Dr. Utter, Defendants have failed and continue to fail to comply with the billing guidelines established under Florida law by employing a Predetermined Protocol designed to exploit patients' PIP coverage rather than provide

medically necessary and individually appropriate care, and by misrepresenting the services allegedly performed for the purpose of inflating the potential reimbursement they could and did recover as part of the ongoing scheme to defraud.

57.     As a result of Defendants' conduct, none of the charges submitted for the fraudulently billed services described herein were or are reimbursable and are therefore invalidated, both for each individual charge and for the entirety of the bills submitted on each impacted claim.

### F.      Overview of Defendants' Fraudulent Scheme

#### 1.      The Defendant Clinics Cater to Personal Injury Claims

58.     Since 2018, Defendants have purported to provide medically necessary chiropractic and therapeutic services and goods. After starting with a single clinic, Dr. Utter has expanded operations over the years to now include thirteen separate locations, eight of which are the subject of this Complaint, spanning the I-4 corridor between Daytona Beach and Tampa.

59.     Defendants' scheme is centered on cultivating, building, and maintaining a network of personal injury attorneys and other medical providers throughout central Florida to ensure a constant stream of patient referrals to the Defendant clinics.

60.     To foster these efforts, Defendants promote their services on a website (www.pipdocs.com) highlighting that the clinics specialize in treating persons involved in automobile accidents. A recent prior iteration of the website featured Dr. Utter on the home page under a banner stating "Auto Injury Doctor" along with his photo and a brief blurb about the need to seek immediate care following a motor vehicle accident. Many of the other website hyperlinks tout the Defendant clinics' ability to treat injuries stemming from auto accidents. The current version still prominently displays Dr. Utter, this time directing the viewer to his biography after clicking on the "Learn More About Preferred Injury Physicians" hyperlink. No other chiropractor affiliated with the Defendant clinics is highlighted in this manner.

61.     The website also hosts many blog entries that focus on the medical-legal aspects of the Defendant clinics' practice. For example, one penned by Dr. Utter is entitled "What is PIP Insurance?" This outlines Florida's PIP law and the need for potential patients to seek care quickly following their accident. Defendants emphasize that their services extend beyond simply treating patients. The blog entry notes they are "here to help you with any questions you may have about how your PIP Insurance will affect your ability to receive care" and will "help you diagnose any health issues that you may have incurred as a result of your car accident injury, which could prove vital in your case against a potentially negligent driver, if you decide to seek legal representation for your accident."

62.     As recently as July 16, 2020, a blog entry was added to the website promoting the interrelationship between personal injury counsel and the Defendant clinics. Within the post titled "10 Tips for Finding a Car Accident Injury Doctor in Brandon, FL" is the tip captioned "An Attorney Can Help Find an Accident Injury Doctor." Here, the blog specifically states "[t]hese **attorneys** will create a detailed care plan and calculates[sic] current and future medical needs," and "[t]hey may hire medical experts to **work on the case with the health care team** to review how these injuries have effected[sic] the quality of life and day to day functions." (emphasis added)

63.     To further entice patients involved in car accidents to seek care with the Defendant clinics, and to entice personal injury attorneys to send their clients to them, Defendants actively promote that free transportation to and from the Defendant clinics is available to "qualifying injured patients." These patients are expressly identified on the website as persons who suffered injuries in an automobile accident. This offer is not extended to any other segment of the Defendant clinics' patient population.

64.     All employees of the Defendant clinics are listed by name and job title on the individual

16

clinic location links. Many of the non-chiropractor employees are identified as "marketers" and at least one employee was identified on an earlier iteration of the website as a "runner." This term has a unique and specific connotation in the realm of automobile accident personal injury law, as it is used to describe a person whose solicits and secures potential patients and clients to be directed to specific treatment providers and attorneys, often with some associated financial or reward component given to the runner and/or patient/client for performing those services.

65.      In addition to the public solicitation of patients as described above, Defendants actively and aggressively market the Defendant clinics to personal injury attorneys and other medical providers. By creating a cross-referral relationship with other medical providers, these efforts allow the Defendant clinics to expand their patient base and establish treatment networks across different medical disciplines. This, in turn, makes the Defendant clinics more marketable and attractive to the personal injury attorneys they deal with – the attorneys can direct patients to the Defendant clinics knowing that they will not only receive the chiropractic care needed to build their personal injury claims but can be directed to other medical providers needed to further bolster those claims. Further, to extend Defendants' geographic reach, and thus increase reimbursement opportunities, the website provides a "Partner Application" link. This is an open invitation to other medical providers to affiliate themselves with the Defendant clinics.

### 2.      Securing Favorable Rubber Stamp EMC Determinations to Maximize PIP Benefits

66.      Defendants further ensure access to the higher first-party limits by directing patients to selected physicians for EMC evaluations, after which an EMC determination is issued. Without an EMC determination, Defendants' ability to recover reimbursement for treatment of sprain and strain soft tissue injuries would be capped at $2,500. However, an EMC determination allows Defendants to treat the patient and bill and recover up to the full PIP coverage limits of $10,000.

67.     In many, if not most, instances, the EMC determination obtained on behalf of Defendants' patients is based on nothing more than a review of the Defendant clinics' initial evaluation notes and exam findings. Patients are not separately evaluated or examined by an outside EMC physician. Instead, the finding that these patient suffered an EMC is a rubber stamp premised on Defendants' purported clinical findings, which are included in the Chiropractic Records provided to the EMC physician.

68.     Specifically, Defendants pay one particular provider $100 for each EMC report he generates. This provider's reports usually state he evaluated the patient on the same date the patient supposedly underwent an initial examination with one of the Defendant clinics. Many of these EMC reports state that one of the Defendant clinics' chiropractors helped facilitate the exam, purported to have been conducted using telemedicine technology. These representations belie the EMC provider's own account of the process, namely that the vast majority of patients, when offered the option of having this provider participate via telemedicine in their evaluation, decline and opt to have him only evaluate their treatment records. It does not appear that patients are even offered the option of having an EMC physician participate or are even aware that this record evaluation has been conducted and an EMC determination issued.

69.     In reality, these EMC reports are nothing more than verbatim copies of what is documented in the Defendant clinics' initial evaluation reports. The only distinction between the two reports is that the initial evaluation report sets forth a treatment plan at its conclusion whereas the EMC report substitutes the requisite statutory language confirming the presence of an EMC for the plan discussion. A three-patient sample of Initial Evaluation Notes with the corresponding EMC reports illustrating the cut-and-paste nature of the latter are attached as **Exhibit C**.

70.     Defendants obtain these reports by transmitting documentation of a given patient's

18

examination electronically to the EMC provider, who in turn generates and returns a report under its own letterhead containing the EMC determination language necessary to allow Defendants' access to the patient's higher coverage limits.

71.    The EMC reports often contain conflicting statements asserting the EMC consultation was performed either telephonically or via teleconferencing and that the patient presented to the EMC provider for evaluation. But neither manner of exam appears to occur, as there does not appear to be contact between Defendants' patients and the EMC provider.

72.    For some patients of the Defendant clinics, EMC determinations are secured from another medical facility whose reports offer even less of a pretense that some consideration was given to the patients' treatment records or that an examination was performed before concluding the patient suffered an EMC.

73.    Instead, the Defendant clinics rely on a simple form captioned as "Notice of Emergency Medical Condition (EMC) CERTIFICATE." No representations are contained in this report to document that any patient-focused contact or evaluation occurred. The findings and opinions attributed to the EMC medical professional are limited to stating that the patient suffered an EMC based on the presence of "acute symptoms", which, without immediate medical attention, could result in serious jeopardy to the patient's health, serious impairment of bodily function or serious dysfunction to a body part. A three-patient sample of these EMC certificates, from two different such EMC medical professionals, illustrating the averments set forth herein is attached as **Exhibit D**.

74.    Additionally, the patient signs this form from the second EMC provider attesting that the symptoms reported to the physician were true and accurate and that the "physician has explained to my satisfaction the need for future medical attention and the harmful consequences to my health

which may occur if I do not receive future treatment." The patient signature line accompanying this statement appears under language stating "[i]njured patient receiving this diagnosis or legal guardian of said injured patient". This suggests that the patient is signing and acknowledging the EMC determination contemporaneous with the EMC physician's evaluation. Yet, it appears that, on at least some occasions, patients did not sign and acknowledge the EMC determination contemporaneous with the EMC physician's evaluation and signature. Instead, patients have sometimes affixed their signatures before the EMC physician's issuance of a particular EMC Certificate, raising further questions whether the evaluation was actually performed. **See id.**

75.     Neither Defendants nor the provider performing the EMC evaluation submit billings to Plaintiffs for the purported service to Plaintiffs.

76.     Instead, Defendants utilize EMC providers such as those highlighted in the preceding paragraphs and others like them, with Defendants often providing the compensation for the EMC services, knowing they will receive an EMC determination allowing them to access patients' full PIP limits by purporting to treat and bill pursuant to the Predetermined Protocol. This arrangement serves to further Defendants' financial goals without regard to whether their patients achieve any success with recovery from their purported injuries.

77.     Thereafter, patients treating with the Defendant clinics receive treatment pursuant to the Predetermined Protocol set forth more fully below.

### 3.     Final Reports Generated to Bolster Bodily Injury Claims

78.     The final evaluation reports issued by the clinics are illustrative of Defendants' inflation of the severity of patients' injuries to ensure both their PIP claims and potential bodily injury claims are fully documented to extract maximal value in settlement. While the introductory paragraphs of these reports – i.e., those sections providing patient-specific information on their exam and

diagnostic testing findings and treatment received – appear to contain content which is individualized to the patient for whom the report was issued, all discussion pertinent to patients' final prognoses, causation, permanency, need for future treatment, and impairment are the product of template language utilized for most patients. Attached as **Exhibit E** is a three-patient sample of final evaluation reports illustrating the template reporting.

### G.   The Operation of the Defendant Clinics in Violation of Florida Law After the Suspension of Dr. Utter's License

79.    Pursuant to Florida's Health Care Clinic Act, facilities wholly owned by a physician are exempt from being required to obtain a license to operate from the Agency for Health Care Administration. § 490.9905(4)(g). Such exemption applies to "a sole proprietorship, group practice, partnership or corporation that provides health care services by licensed health care practitioners under  . . . chapter 460 [chiropractic physicians]. . .  and that is wholly owned by one or more licensed health care practitioners." Id.

80.    This exemption is not without its limits. Specifically, "a health care practitioner may not supervise services beyond the scope the practitioner's license, except that, for purposes of this part, a clinic owned by a licensee in s. 456.053(3)(b) which provides only services authorized pursuant to s. 456.053(3)(b) may be supervised by a licensee specified in s. 456.053(3)(b)." Id.

81.    Reimbursement of medical benefits under the No-Fault Law may only be issued for "[i]nitial services and care that are lawfully provided, supervised, ordered, or prescribed by . . . a chiropractic physician licensed under chapter 460." § 627.736(1)(a)1. Follow-up services and care for injuries sustained in a motor vehicle accident and which are covered under the No-Fault Law may be provided by the same chiropractic physician or "an entity wholly owned by one or more . . . chiropractic physicians licensed under chapter 460." § 627.736(a)2.b.

82.    The concept of the "wholly owned" health care entity is incorporated into the No-Fault

Law, which provides:

> [A] proprietorship, group practice, partnership, or corporation that provides health care services rendered by licensed health care practitioners and in which licensed health care practitioners are the business owners of all aspects of the business entity, including, but not limited to, being reflected as the business owners on the title or lease of the physical facility, filing taxes as the business owners, being account holders on the entity's bank account, being listed as the principals on all incorporation documents required by this state, and having ultimate authority over all personnel and compensation decisions relating to the entity."

§ 627.732(17), Fla. Stat.

83.    As set forth in paragraph 11, above, and as evidenced by the Articles of Incorporation filed with the State of Florida, Dr. Utter is the sole owner, incorporator, officer and/or director, and registered agent for each Defendant clinic that is a party to this action. Copies of each Defendant clinic's Articles of Incorporation are attached collectively as **Exhibit F**.

84.    In his capacity of holding the above-described positions, Dr. Utter has been and is responsible for managing, overseeing and directing the operations of all of the Defendant clinics at all relevant times.

85.    However, Dr. Utter cannot lawfully continue acting in this capacity as the result of recent action taken by the State of Florida Department of Health. Specifically, the State Surgeon General, acting within the powers granted by the Florida legislature pursuant to chapters 20, 456 and 460, Florida Statutes, issued an Order of Emergency Restriction of Dr. Utter's License on April 8, 2020. This Order imposed an immediate restriction upon Dr. Utter prohibiting his continued practice of chiropractic medicine. A copy of the Order is attached as **Exhibit G**.

86.    On April 22, 2020, the Department of Health initiated proceedings against Dr. Utter with the filing of an Administrative Complaint, alleging, among other things, that Dr. Utter was "unable to practice chiropractic medicine with reasonable skill and safety." The relief sought by the

Department of Health includes the entry of an order permanently revoking or suspending Dr. Utter's chiropractic license or otherwise restricting his ability to practice chiropractic medicine. A copy of the Administrative Complaint is attached as **Exhibit H**.

87.    Notwithstanding this recent action, Dr. Utter, continues to be the sole owner, incorporator, officer and/or director, and registered agent for each of the Defendant clinics and has not relinquished his role in any of these capacities. He continues as such even though he no longer is able to actively practice chiropractic medicine.

88.    As further evidence of Dr. Utter's disregard for the statutory and regulatory schemes intended to regulate the legitimate practice of chiropractic in the State of Florida and ensure that patients treat with properly licensed providers and entities, on October 23, 2020 –  six months after his license to practice was suspended – Dr. Utter incorporated two additional clinics, Preferred Injury Physicians of Temple Terrace, Inc. and Preferred Injury Physicians of St. Petersburg, Inc. Copies of these clinics' Articles of Incorporation are attached collectively as **Exhibit I**. Consistent with the filings with the Department of State for each of the named Defendants, Dr. Utter is the sole incorporator and owner of these two new clinics. He continues to own, operate, and/or control each clinic while his license remains in suspended status as he faces complete revocation of that license.

89.    Further, Dr. Utter continues to hold himself out to the public as a fully practicing chiropractor, especially on the Defendant clinics' website. Ten of the clinics' links identify the chiropractor or chiropractors staffing the clinic as well as support staff (no staff is identified for three clinics). For each Defendant clinic, Dr. Utter is listed as "***Dr.*** Travis Utter" and is identified as "***Doctor/Owner (CH10487)***". (emphasis added). The latter code refers to the chiropractic license number assigned to Dr. Utter by the State of Florida Department of Health.

90.     Further, a brief biography accompanies Dr. Utter's photo and title. It specifically states that "Dr. Travis Utter *is* a Daytona Beach chiropractor and auto injury doctor" and that "He currently *holds* licenses in Florida and Kentucky." (Emphasis added.) This is misleading on several fronts. First, the statement that Dr. Utter "is a Daytona Beach chiropractor and auto injury doctor" is intended to represent to the general public that he currently practices chiropractic medicine and holds the necessary licensure to do so. Second, his license in Florida is currently encumbered as a result of the suspension outlined in the preceding paragraphs. Thus, the statement that he "holds" a Florida license carries the same false import as stating that he "is a Daytona Beach chiropractor." Lastly, the statement that he is a licensed Kentucky chiropractor is also misleading. Dr. Utter held a valid license in Kentucky for a limited period of time (April 11, 2013 to April 16, 2014), a time frame during which he owned and operated several of the Defendant clinics addressed in this Complaint. Since its expiration, Dr. Utter's license has been in "Retired" status.

91.     The continued operation of each Defendant clinic, irrespective of whether licensed chiropractors administering are the purported treatment received by patients, since the suspension of Dr. Utter's chiropractic license took effect violates Florida law.

92.     Specifically, Dr. Utter's continued ownership and operation of the Defendant clinics is expressly prohibited and amounts to the unlicensed practice of chiropractic medicine. By virtue of the suspension, Dr. Utter is an unlicensed chiropractic physician, which is defined as a "chiropractic physician whose license has been suspended, relinquished or revoked by the State of Florida . . . arising out of a disciplinary action." 64B2-16.009(1), Fla.Admin.Code.

93.     Additionally, Florida law prohibits a licensed chiropractic physician from continuing in a "business association" with an unlicensed chiropractic physician, and such associations include those where an unlicensed chiropractic physician "owns any interest" or is a "corporate director or

officer" or "has the right to direct or control the professional judgment of the treating chiropractic physician". 64B2-16.009(2)(a)-(c), Fla.Admin.Code. Further, a licensed chiropractor "shall not permit a person . . . who otherwise employs . . . the licensed chiropractic physician to render services to a patient, to direct or regulate the chiropractic physician's judgment in rendering services." 64B2-16.009(3), Fla.Admin.Code. Thus, the chiropractors who have continued to administer services to patients of the Defendant clinics are practicing in violation of Florida law.

94.     Accordingly, any and all bills submitted by the Defendant clinics for services purportedly provided to patients on or after April 8, 2020 were and continue to be not compensable under Florida law.

### H.     Defendants' Fraudulent Evaluations and Treatment

95.     Patients begin their treatment at the Defendant clinics by undergoing an examination with a chiropractor who then prepares a report containing the near-identical non-credible findings for virtually all patients, resulting in virtually identical treatment recommendations for every patient, and the provision of treatment services and goods consistent with those recommendations.

96.     The near identical content of Defendants' initial evaluation reports is facilitated by using a common software program (Chiro Touch) to generate these reports. This software allows for every one of Defendants' chiropractors at all of the clinics to draw from a shared initial evaluation template to issue cookie-cutter reports across the patient population.

#### 1.     Defendants' Fraudulent Initial Examinations

97.     The purportedly individualized initial examination findings are documented in typed reports ("Initial Evaluation Notes"), which are noteworthy not only for their brevity and lack of necessary clinical detail, but also for the patterns that emerge when a sufficient number of charts

are evaluated together. **<u>See</u> Exhibit J** for a representative example of the fraudulent Initial Evaluation Notes.

98.     Defendants' Initial Evaluation Notes consistently document identical examination findings for the majority of patients. Specifically, the reports reflect that most patients are found to have (a) positive cervical orthopedic test results, including maximum foraminal encroachment testing, Jackson's Test, and cervical compression testing, with positive results for the latter two most often being found bilaterally; (b) normal upper and lower extremity reflexes bilaterally; (c) normal gait; (d) normal muscle strength in the upper and lower extremities; (e) loss of range of motion in all spinal regions – cervical, thoracic, and lumbar; (f) tenderness to palpation in all spinal regions; and (g) muscle spasm in all spinal regions. **Exhibit A, Columns H – Q**.

99.     Defendants use these standardized initial examination findings to substantiate their standardized recommendations that patients will treat at a frequency of four times per week, most often for a duration of three weeks, during which they are to receive the same set of passive modalities – manual therapy, mechanical traction, hot/cold packs, electric stimulation, ultrasound and chiropractic manipulation. Most often, the treatment plan also includes an order for DME, either a TENS unit or a lumbar device. The prescription of this pre-determined course of treatment regardless of individualized factors is not credible and is fraudulent.  In a legitimate clinical setting, different treatment plans, including different treatment modalities, different treatment timetables and different needs for DME, would be implemented based on individual patient diagnoses and factors. **<u>Id.</u>**, Columns R – V.

100.    The non-individualized Initial Evaluation Notes are crafted in this fashion to justify the pre-determined course of treatment provided to patients at the Defendant clinics despite the fact that this "one size fits all" care is not calculated to, and in fact does not, address the unique medical

needs of each patient.

101.    The patterns with respect to patient range of motion testing across all of the Defendant clinics are particularly telling. When patients present to the clinics, they invariably complain of either neck pain, low back pain, or both. As part of initial evaluations, Dr. Utter and the other chiropractors at the Defendant clinics purport to evaluate each patient to determine if they demonstrate any limitation in range of motion in the affected areas of the purported trauma from the accident. In the legitimate clinical setting, this evaluation involves testing six separate planes of motion in the cervical spine, the thoracic spine, and the lumbar spine. Conversely, Defendants' Initial Evaluation Reports simply state that range of motion was reduced in all of the reported spinal regions without reference to the planes tested, whether certain planes elicited greater or less reductions in motion, or no reduction at all, and without specific results elicited such as the measurement of the reduction in terms of degrees. **Exhibit A, Column L, and Exhibit J**.

102.    It is unusual that any given patient would have diminished range of motion in every region of the spine for every plane tested. Yet this unlikely finding is documented for a majority of patients in the Initial Evaluation Notes by Defendants at eight different clinics regardless of individualized factors for any patient. **Id.**

103.    Similarly, Defendants' performance of a wide range of orthopedic tests on all spinal regions and extremities, irrespective of the results elicited on that testing, is not credible. In a legitimate clinical setting, all patients would not require performance of the same set of orthopedic tests based on their presenting complaints. Orthopedic tests such as those performed by Defendants as a matter of routine, should only be performed to the extent a patient's unique presenting condition and complaints suggest the need for one or more of those tests.

104.    Cervical testing occurs in a legitimate clinical setting to determine the root cause of upper

extremity radicular symptoms such as extremity pain, numbness, or tingling. Likewise, the reported lumbar tests are also, in a legitimate clinical setting, performed to determine the root causes of lower extremity radicular symptoms. Positive test results are suggestive of significant orthopedic diagnoses such as radiculopathy, nerve root compression, disc fracture or other disc pathology. It is not expected that a substantial portion of any clinic's patients would present with complaints or symptoms suggesting such pathologies, or that those patients who do complain of such symptoms, and are tested as appropriate, would demonstrate a positive result suggesting potentially significant orthopedic disorders.

105.    Yet Defendants' initial exams purportedly find that patients sustained significant injuries such as those suggested above, particularly in the cervical spine as most patients elicit at least one positive finding for cervical compression testing, Jackson's Test, and maximal foraminal encroachment, with many patients being documented as having positive findings on all three tests. Defendants also implausibly documented that most patients' positive Jackson's Test and maximal foraminal encroachment findings were present bilaterally. **Id., Columns O – Q**.

106.    Such potentially significant diagnostic clinical findings would warrant referral for additional specialized care such as orthopedic and/or neurological specialist intervention, or even establish that no chiropractic care was appropriate due to the severity of the findings. Nonetheless, Defendants' referrals were limited to MRI testing. These studies are utilized to create a documented pretext in patients' charts of the need for ongoing treatment at the Defendant clinics, or at least until coverage limits are exhausted or nearly exhausted. Limiting patient care to essentially these two components (chiropractic and MRI testing) ensures that all or most of patients' coverage limits will be exclusively available to Defendants and those facilities where the MRIs are performed.

107.   The validity of the documented initial orthopedic testing findings noted above is further undermined when considering the inconsistency of those findings. In a legitimate clinical setting, gait testing (that is, performing a visual evaluation of a patient's ability to walk), muscle strength testing and reflex testing are used in determining if the patient is guarding against back pain or evidencing other signs of neurological or orthopedic injury. Despite the high incidence of reported findings of loss of spinal range of motion in all spinal regions, positive cervical testing indicating the possible presence of radiculopathy, and the presence of tenderness and spasm in all spinal regions, most patients are found to have a normal gait, and normal muscle strength and reflexes in the upper and lower extremities. **Id., Columns H – K**.

108.   Ultimately, Defendants diagnose patients as purportedly suffering the same, or nearly the same, combination of spinal injuries. This is not medically plausible. Virtually all patients are diagnosed with soft tissue injuries to at least two regions of the spine and most patients are diagnosed with injuries to all three regions of the spine.

109.   Particularly egregious examples of Defendants' Predetermined Protocol are found in the records of patients who treat at the clinics following involvement in the same motor vehicle accident. For example, the initial reports for patients MGL, a 35-year-old female (driver), JL, a 14-year-old male (right rear seat passenger), and AL, a 57-year-old female (front seat passenger), reveal remarkable similarities in the subjective complaints, examination findings, diagnoses, recommended treatment plans, and dispensing of DME for all three individuals, despite characteristics unique to each patient. The three first presented to PIP of Orange City on July 16, 2018 following involvement in a July 3, 2018 motor vehicle accident. The initial examinations were purportedly performed by the same chiropractor, who prepared separate evaluation notes for each patient. According to the "Subjective" section of the notes, MGL, JL and AL all purportedly

reported complaints of cervical, thoracic, lumbar and right knee pain; pain scale levels in each area of pain within the same range (6/10 to 8/10); and relatively equal frequency that pain was present. In addition to these symptoms, AL purportedly reported complaints of pain in the right hip, right leg and right calf, and numbness and tingling in her left hip, left buttock, left leg, left posterior knee, left calf and chest. MGL purportedly reported the same set of right-sided complaints as well as right ankle and right foot pain. On examination, the "Objective" section of each patient's Initial Evaluation Notes documented consistent findings on an array of orthopedic tests, including normal bilateral muscle strength testing and upper and lower extremity reflex testing; range of motion loss in all spinal regions (cervical, thoracic and lumbar); bilateral muscle spasm and tenderness on palpation to all spinal regions; negative cervical compression and distraction testing; positive Jackson's test; sternal compression for mid back pain; lateral compression for right-sided pain; bilateral Kemp's and straight leg raise testing for low back pain; and Bechterew's for intervertebral disc protrusion. The only distinguishing findings were maximum foraminal encroachment testing (MGL and JL had positive findings bilaterally; AL had a positive finding on the right but negative on the left); Valsalva's testing (MGL had a positive finding for low back pain, JL had a negative finding, and AL had a positive finding for chest pain); and additional orthopedic testing of the knee was performed on JL only. As a result of these findings and having received diagnoses covering every spinal region, all three were prescribed identical treatment consisting of chiropractic manipulation, manual therapy, electric stimulation, ultrasound, mechanical traction and hot/cold packs, directed to treat four times a week for two weeks, and were each prescribed a TENS unit for home use. No diagnostic testing was ordered for any of these patients on this encounter.

110.    Similarly, patients EDR, a 47-year-old female, and ER, a 68-year-old female, were involved in a May 10, 2017 motor vehicle accident and presented for evaluation on May 11, 2017

to PIP of Brandon. Both patients purportedly underwent evaluation with the same chiropractor, who prepared their Initial Evaluation Notes. The "Subjective" section documented that both patients purportedly reported the same set of complaints – headaches, bilateral cervical, thoracic, lumbar and sacroiliac pain, bilateral trapezius pain, and neurological symptoms (numbness and tingling in both feet for EDR and bilateral numbness and tingling in both hands for ER). Except for Valsalva's testing (EDR had a positive finding and ER a negative finding), identical findings on thirteen separate orthopedic tests were reported for both patients. As a result of these evaluations, identical diagnoses – post-traumatic headache, not intractable; cervical and lumbar radiculopathy; cervical, thoracic and lumbar sprain; cervical, thoracic and lumbar subluxation complex (vertebral); myalgia; and other myositis, multiple sites – were rendered for both patients. They were each prescribed an identical course of treatment consisting of electric stimulation, chiropractic manipulation, manual therapy, ultrasound, mechanical traction and hot/cold packs with a recommended frequency of four times per week for a three-week period after which they would undergo a reevaluation. A TENS unit was also prescribed separately for EDR and ER. No diagnostic testing was ordered for either patient on this visit.

111.   Based upon non-individualized, rote and pre-determined elements of purported initial evaluations, Defendants prescribe most patients an identical pre-determined treatment plan. In legitimate clinical care, the types of treatment appropriate for any given patient – as well as the level, frequency, and duration of the various services – should vary depending on the unique circumstances of each patient. The treatment plan prescribed at the Defendant clinics, however, recommends that most patients treat four times per week and prescribes a core set of six modalities – chiropractic manipulation, manual therapy, mechanical traction, hot/cold packs, electric stimulation, and ultrasound. **Exhibit A, Columns R – T**. A majority of patients were also

prescribed at least one piece of DME (a TENS unit or a lumbar brace) on this visit. **Id., Columns U - V**.

112.    Given that the same or similar examination findings, diagnoses, and recommended treatment plans appear across most patients who purportedly treat with any of the eight clinic Defendants, such findings are not credible and do not reflect legitimate examination results, but instead reflect predetermined results that Defendants rely upon to justify the need for patients to treat pursuant to the Predetermined Protocol.

### 2.    Fraudulent Billing for Ultrasound Services

113.    One of the modalities patients purportedly receive on the majority of visits at all the Defendant clinics is ultrasound, regardless of any individualized factors unique to patients.

114.    In a legitimate clinical practice, this modality is utilized to decrease inflammation and pain during the acute stage of care. This modality is traditionally administered by applying a gel to the area of the patient's body to be treated using a handheld ultrasound unit to move around that area to provide deep heat to muscles and joints to promote healing.

115.    The Defendant clinics purport to administer this modality utilizing a hands-free ultrasound unit. This is a self-contained device which is applied to the affected area of the patient's body by the Defendant clinics' staff. After the unit is set on the patient's body, the chiropractor or assistant leaves the room and does not return until a preset timer expires.

116.    In a legitimate clinical practice, a provider properly billing ultrasound under CPT code 97035 administers the service while maintaining direct, one-to-one contact with the patient. Ultrasound is designated in the CPT guidelines within the "supervised" class of physical therapy modalities. Under the CPT code guidelines, the skilled professional's "constant attendance" is a prerequisite to the proper administration of the modality and submission for reimbursement.

117.    The CPT guidelines draw no distinction between the traditional means of administering ultrasound (through the application of a gel to the treated areas over which the ultrasound wand is applied) and the self-contained units used at the Defendant clinics. Accordingly, legitimate billing of CPT code 97035 is premised upon the provider's constant attendance during the provision of the service.

118.    Per Dr. Utter's admissions, every bill for ultrasound submitted by the Defendant clinics fraudulently represents that it was administered in accordance with the CPT code guidelines, and thus misrepresents the Defendant clinics' entitlement to reimbursement for the service. Specifically, Dr. Utter testified that:

> Q.      . . . is someone supervising that ultrasound?
> A.      It's supervised.
>                                 . . .
> Q.      [The chiropractor or registered chiropractic assistant] would have been in the room at the same time and for the entire treatment with this ultrasound, [electric stimulation] and manual therapy; is that your testimony?
> A.      No.
> Q.      Okay. So, how does that work out?
> A.      They apply the ultrasound pack and it has four heads on it, so you don't have to sit there and wand it for the whole times. It actually has four heads that rotate through the area.
> Q.      So what you're saying is, that it's supervised. What do you mean by supervised?
> A.      Supervised is how it's coded and the CPT codes.
> Q.      Okay. I understand how it's coded. But, you're telling me that [the chiropractor or registered chiropractic assistant] is actually not supervising the 97035?
> A.      She goes in, she applies it, she comes in, she checks on the patient, so it is being supervised. She's not leaving the building.
>                                 . . .
> Q.      Do you know how often [the chiropractor or registered chiropractic assistant is] checking on the patient while –
> A.      I don't know how many times she does. Sorry, sir.
> Q.      That's all right. Do you know how many times [the registered chiropractic assistant is] checking on the patient while ultrasound is being applied?
> A.      I don't know how many times she checked on the patient that day.

119.    Additionally, the Defendant clinics' routinely reinforce their false and fraudulent representations in bill submissions by adding the typed statement "supervised" in conjunction with CPT code 97035 on the CMS-1500 forms submitted to Plaintiffs. The corresponding treatment note entry supporting each bill submission for ultrasound omits any reference or explanation that it was not performed as a "supervised" physical therapy modality per the CPT code guidelines. Instead, it merely identifies, without more, the name of the person performing the service, the time it was administered, and the area to which was administered. A sample treatment note entry and the corresponding billing submission entry appear below.

Ultrasound was performed on the left lumbar region by Rieky King, DC for 15 minutes.

| 06 14 2018 | 06 14 2018 | 11 | | 97035 | | supervised | ABCD | | 2900 | 1 | | NPI | 1629423942 |

120.    While Defendants misrepresent to Plaintiffs that ultrasound is a supervised service, they tell at least some of their patients that the service is in reality an unattended modality. To the contrary, and at least more recently, Defendants have had some patients execute a form captioned "UNATTENTED[sic] ULTRASOUND." This form explains, in basic terms, that the Defendant clinics utilize "the automatic, hands-free AutoSound" device to administer therapeutic ultrasound as a form of deep heat therapy. A sample of this form is attached as **Exhibit K**.

121.    Each and every one of Defendants' submissions of CPT code 97035 fraudulently represents the service purportedly provided to the Defendant clinics' patients and their rightful entitlement to reimbursement for same.

122.    Defendants make these misrepresentations in their billing to ensure they will recoup a higher amount of reimbursement than had they billed the purported service utilizing the unlisted physical modality billing code (CPT code 97039). Billing under the latter results in the issuance of reimbursement at about 50% of what would be paid for CPT code 97035.

123.    Accordingly, and pursuant to §627.736(5)(b)1.c., each bill submission containing the fraudulent charges for CPT code 97035 invalidates all the charges submitted for all purported treatment and related services purported performed and billed on that same service date, and for which reimbursement was issued. Therefore, State Farm is entitled to recover all monies paid on each of those bill submissions.

**3.      Defendants' Fraudulent or "Knowingly" False or Misleading Billing of Chiropractic Manipulation (CPT Codes 98940 and 98941) Together with Manual Therapy (CPT Code 97140) and/or Mechanical Traction (CPT code 97012)**

124.    The legitimate professional often utilizes modalities such as chiropractic manipulation, manual therapy, and mechanical traction in the course of patient care. Each of these modalities may be used to achieve specific and distinct therapeutic goals individually when applied to separate regions of the body. However, the performance of manual therapy and mechanical traction are duplicative and medically unnecessary when applied to the same area treated with chiropractic manipulation on the same visit date.

125.    Specifically, chiropractic manipulation may be billed using CPT code 98940 (for an adjustment of one to two spinal regions) or CPT code 98941 (for an adjustment of three to four spinal regions). Billing under either code includes several services, including the performance of a pre- and post-manipulation patient assessment, the actual adjustment, ***and*** certain other manual applications to the patient's body, which are the same applications performed as part of the manual therapy and/or mechanical traction services. *Current Procedural Terminology 2017, Standard Edition*, American Medical Association, 2017.

126.    Manual therapy involves the administration of several therapeutic techniques, such as mobilization, manual traction and manual lymphatic draining, to mobilize and manipulate soft tissue and joints. Id. Mechanical traction is yet another technique used to mobilize various

segments of the spine to correct misalignment, but is performed using a piece of equipment and does not rely upon the manual application by the chiropractor or an assistant.

127.    In legitimate chiropractic practice, it may be appropriate to perform each of the above-identified services on the same patient visit provided these different services are administered to different areas of the spine. Pursuant to AMA guidance and § 627.736(5)(d), Fla. Stat., the legitimate provider would support the performance of each service by clearly delineating in the treatment notes the separate services performed and the medical necessity for each service to establish its rightful entitlement to reimbursement for the distinct treatments, especially in those instances where the provider submits the "-59" modifier to support a billed CPT code. By appending the "-59" modifier to CPT codes 97140 (manual therapy) and/or 97012 (mechanical traction), the legitimate provider affirmatively represents to the payor (in this case, Plaintiffs), that these procedures were administered to separate body regions from the billed spinal manipulation CPT code (98940 or 98941) and therefore both are properly compensable.

128.    Conversely, billing for manual therapy and/or mechanical traction as separate and distinct services is improper when either service is performed on the same spinal region on the same visit that chiropractic manipulation is also performed. The services are medically unnecessary because the services and techniques provided as part of manual therapy and/or mechanical traction are encompassed within the services provided as part of the chiropractic adjustment.

129.    As part of the scheme to defraud Plaintiffs, Defendants regularly and routinely submitted bills to Plaintiffs which misrepresented the services provided, both on the CMS-1500 form submission and supporting treatment note. **See Exhibit B, Columns J – K, M and P**. For visit encounters where manual therapy and/or mechanical traction  were purportedly provided on the same visit date that spinal chiropractic manipulation was also provided, Defendants appended the

"-59" modifier to one or more of each corresponding CPT codes. While Defendants' use of the modifier on the CMS 1500 billing submission represented that Defendants provided separate treatments to multiple regions of the patient's body, the treatment records show nothing more than the provision of duplicative and overlapping care to the same spinal regions. In fact, the billing submissions show that every service provided on a treatment date are administered for the exact same set of diagnoses as reflected in the example below:

Mechanical traction was performed on the cervical, thoracic, lumbar, and sacroiliac regions by Alishia Wright for 8 minutes.

Manual therapy in the form of soft tissue mobilization was performed on the left cervical, right cervical, left trapezius, right trapezius, left mid thoracic, right mid thoracic, left lower thoracic, right lower thoracic, left lumbar and right lumbar region(s) by Jessica Palmer for 15 minutes.

Chiropractic manipulative therapy (CMT) was rendered at the C4, C7, T1, T2, T6, T7, T12, L1, L5 and sacrum levels.   The method used was Diversified.

| 21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY. Relate A-L to service line below (24E) | | | | ICD Ind. | 0 | | 22. RESUBMISSION CODE | | ORIGINAL REF. NO. | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A. G44319 | B. M5412 | C. M5416 | D. S134XXA | | | | | | | | | |
| E. S233XXA | F. S335XXA | G. M79I | H. M6089 | | | 23. PRIOR AUTHORIZATION NUMBER | | | | | | |
| I. M62838 | J. | K. | L. | | | | | | | | | |

| | 24. A. DATE(S) OF SERVICE From | | | | To | | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS       MODIFIER | | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Fam. Plan | I. ID. QUAL. | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | MM | DD | YY | MM | DD | YY | | | | | | | | | | |
| 1 | 06 | 19 | 2018 | 06 | 19 | 2018 | 11 | | 97140 | -59 | ABCD | 13800 | 2 | | NPI | 1629423942 |
| 2 | 06 | 19 | 2018 | 06 | 19 | 2018 | 11 | | 97012 | | ABCD | 3800 | 1 | | NPI | 1629423942 |
| 3 | 06 | 19 | 2018 | 06 | 19 | 2018 | 11 | | 98941 | 59 | ABCD | 9400 | I | | NPI | 1629423942 |
| 4 | 06 | 19 | 2018 | 06 | 19 | 2018 | 11 | | E0855 | | ABCD | 98844 | 1 | | NPI | 1629423942 |
| 5 | 06 | 20 | 2018 | 06 | 20 | 2018 | 11 | | 97012 | | ABCD | 3800 | 1 | | NPI | 1629423942 |
| 6 | 06 | 20 | 2018 | 06 | 20 | 2018 | 11 | | G0283 | | ABCD | 2760 | I | | NPI | 1629423942 |

130.    Thus, each billing submission for dates of service where Defendants purportedly administered both a manual therapy procedure and/or mechanical traction and a spinal chiropractic manipulation procedure and used the "-59" modifier to describe those services fraudulently represented that these procedures were properly compensable under § 627.736(5), Fla. Stat., and the applicable policy of insurance issued by Plaintiffs. Defendants have made these misrepresentations with the intention that Plaintiffs will rely on them and issue reimbursement for

separate services to separate anatomical regions, when, in fact, Defendants did not provide such care.

131.    Accordingly, and pursuant to § 627.736(5)(b)1.c., each billing submission containing the fraudulent charges for CPT codes 98940 or 98941 and CPT Code 97012 and/or CPT Code 97140 invalidates all the charges submitted for all purported treatment and related services purported performed and billed on that same service date, and for which reimbursement was issued. Therefore, State Farm is entitled to recover all monies paid on each of those bill submissions.

### 4.    Defendants' Fraudulent "Health and Behavior Assessments"

132.    Regardless of patients' individual complaints and purported initial evaluation findings, most patients also purportedly receive a service identified as a health and behavior assessment on Defendants' billing submissions.  Most patients purportedly receive and Defendant bill for this assessment at least once over the course of treatment, and often more than once as reassessments.

133.    In a legitimate clinical setting, health and behavior assessments may be used to determine whether a patient's injuries and treatment are impacting his or her mental well-being and recovery. Appropriate use of the assessments assists with determining whether psychological services are needed for persons whose problems are physical diagnoses in the absence of a mental health diagnosis.

134.    A properly performed health and behavior assessment will include a health-focused interview, behavioral observations, psychophysiological monitoring, health-oriented questionnaires, and a fifteen (15) minute, face-to-face consultation with the patient. Legitimate health and behavior assessments may only be performed by qualified non-physician healthcare professionals, *i.e.*, a psychologist. A legitimate, qualified professional may bill for these services using CPT code 96150 (initial assessment) or 96151 (re-assessment).

135.    Here, Defendants do not perform legitimate health and behavior assessments, nor is the provision of these services within a chiropractor's professional licensure. Thus, each of Defendants' submissions under CPT codes 96150 and 96151 for payment misrepresents the services actually provided and their entitlement to reimbursement.

136.    Further, Defendants fraudulently represent that outcome assessment tools, namely, the various disability questionnaires patients complete at the Defendant clinics, are health and behavior assessments. The questionnaires are a set of ten questions asking the patient to rate how his or her pain impacts different activities of daily living on a scale of "0" (no impact at all) to "5" (the pain prevents the patient from performing the activity entirely). A sample set of these questionnaires is attached as **Exhibit L**. The questionnaires are purportedly completed by the patient on an iPad and the responses are calculated to arrive at a disability score to assess the impact of patients' injuries on their ability to perform their overall activities.

137.    The clinical matters addressed in the disability questionnaires do not concern the psychological interplay between the patient's injuries and mental well-being, as would be determined in a proper health and behavior assessment. In fact, after the purported "assessments" are performed, Defendants' treatment records never document that psychological services were considered or recommended as would be appropriate had an actual health and behavior assessment been performed.

138.    The CPT guidelines further prohibit the submission of billing for a health and behavior assessment using CPT code 96150 or 96151 on the same visit encounter where the provider performs an evaluation of the patient using an evaluation and management CPT code (9920X or 9921X).

139.    Defendants' scheme involves the regular billing CPT codes 96150 or 96151 on the same

visit date as CPT code 9920X or 9921X.  By billing these codes together on the same date of service, Defendants represented that separate and distinct services were provided to patients when, in fact, they were not. Each bill submission containing these sets of CPT codes for the same visit date  represents  impermissible and fraudulent unbundling, and a *per se* violation of the No-Fault Law. § 627.736(5)(b)1.e., Fla. Stat. Each one of these bills fraudulently represents that two reimbursable services were provided to patients on the same visit date when, in fact, they were not. For example, Patient JAL, a 23-year-old woman, was purportedly examined on three separate dates (February 8, 2017, March 13, 2017 and March 22, 2017) during her treatment at the No Utter Way location. For each encounter, evaluation and management CPT code 99213 was utilized in the billing submission. Similarly, the Defendant clinic also submitted billing for CPT code 96151 on these dates even though her treatment records only show that she completed a disability questionnaire on the visit. It was impermissible to unbundle the health and behavior assessment service from evaluation and management code, as the service described in the former is encompassed within the latter under the CPT guidelines. **Exhibit B, Columns H – I**.

140.    Accordingly, and pursuant to §627.736(5)(b)1.c., each bill submission containing the fraudulent charges for CPT codes 96150 or 96151, including those service dates where it was billed in conjunction with an evaluation/management CPT code (9920X or 9921X) and those service date where no examination was purportedly performed and billed, invalidates all of the charges submitted for all purported treatment and related services purported performed and billed on that same service date, and for which reimbursement was issued. Therefore, State Farm is entitled to recover all monies paid on each of those bill submissions.

### 5.    Predetermined Treatment Protocol

141.    Regardless of the results of any initial evaluation purportedly performed, any unique

circumstances presented by any individual patient, or any prior care a patient may have received before presenting to any of the Defendant clinics, Defendants subject patients to nearly identical treatment visit after visit. While there may be some differences seen in what modalities one of the Defendant clinics may favor on a daily basis, across the clinic Defendants, the Predetermined Protocol ultimately focuses on the initial rote provision of passive modalities, and later the incorporation of non-descript therapeutic exercises, in a manner that allows the Defendant clinics to bill, on average, six modalities for each visit. **Exhibit B, Column R**.

142.    In most instances, the modalities provided to patients throughout their entire course of treatment at the Defendant clinics are materially the same, despite the wide range of unique circumstances of each patient, including the patient's age, physical characteristics, symptoms, history, and ability to participate in treatment, and his or her response thereto. This combination of treatments, with patients allegedly receiving between five and eight modalities on the large majority of visits, would seldom, if ever, be medically necessary for any patient, let alone for nearly all patients, on every visit, at eight separate office locations. **Id.** To the contrary, good clinical care would indicate no care for some patients, less or even more care for others, and a different variety of modalities for different patients, as opposed to the same treatment plan for patients as is the Predetermined Protocol at the Defendant clinics.

143.    The Predetermined Protocol revolves around the repetitive and medically unnecessary provision of passive modalities, specifically spinal chiropractic manipulation, hot/cold packs, mechanical traction, electric stimulation, mechanical traction, and manual therapy. These modalities are purportedly provided visit after visit, even after active care is introduced. **Exhibit B, Columns J– Q**. By that point in care, the legitimate provider would be working to wean the patient from passive modalities to increase independence and physical capabilities. However,

Defendants continue to provide these passive services throughout treatment, which furthers the Predetermined Protocol to the detriment of their patients' unique rehabilitative needs.

144.    Most patients treating with the Defendant clinics are also referred for diagnostic testing. This is essentially limited to spinal MRIs and are most often ordered on patients' initial evaluation visits.

145.     In a legitimate chiropractic practice, orders for MRIs may be an appropriate diagnostic tool, provided that the patient's history and examination findings suggest the possible presence of a severe condition that requires this study to confirm or rule out the existence of such a condition and to clarify the treating diagnosis(es). From a timing perspective, an order for this testing would be appropriate after the patient has undergone a course of conservative care for four to six weeks without a resolution or improvement of their symptoms coupled with the corresponding objective orthopedic exam findings. An order for the MRI should be clearly supported by the examination and treatment documentation and the legitimate chiropractor may withhold application of certain treatment modalities, including chiropractic manipulation, until the MRI results are obtained.

146.    Here, Defendants typically order spinal MRIs on the initial visit based on nothing more than positive orthopedic examination findings, decreased range of motion, and pain levels, which may not correlate to diagnoses or conditions that would require MRI testing. The purported bases set forth in the Defendant clinics' examination notes fail to identify a medically necessary and reasonable basis for MRI testing.

147.    The average patient undergoes MRI testing around their seventh treatment visit with the Defendant clinics. Almost every one of these patients was administered spinal chiropractic manipulation on at least one visit date before the patient underwent MRI testing and the Defendant clinics documented the MRI results in their Chiropractic Records, with most patients receiving

manipulation regularly as part of their Predetermined Protocol, the outstanding order for an MRI notwithstanding. Indeed, in some instances, the records explicitly stated that the chiropractic manipulation would be delayed until the results of the MRI was received, yet those patients regularly received chiropractic manipulation well before the MRI results were received. For example, patient EV first treated at PIP of Orange City on September 18, 2017 following a September 14, 2017 motor vehicle accident. During her initial evaluation, the chiropractor commenced EV's recommended treatment plan by stating "[b]ased on patient presentation and exam findings the following imaging will be ordered.: Lumbar MRI." The report further stated that EV would be seen four times per week for two weeks and treatment would include various modalities, including spinal chiropractic manipulation "[a]fter reviewing initial exam findings and relevant diagnostic testing and medical records". EV went on to treat with PIP of Orange City on 18 occasions, and purportedly received chiropractic manipulation to the thoracic and lumbar spine on 15 of those visits. Lumbar chiropractic manipulation was administered to two or three levels in each instance and the levels treated varied from visit to visit. These treatments were administered visit after visit even though EV never underwent the recommended MRI and nothing was documented in her Chiropractic Records setting forth why the imaging was not performed. Notwithstanding the radiologist's comment that an MRI of the thoracic spine was recommended due to a finding at T3, the treating chiropractor never ordered that imaging.

148.   As treatment progresses, and even after active care such as therapeutic exercises are introduced, most typically after the MRIs were performed and without regard to what findings were revealed, Defendants continue to treat patients in the same rote fashion pursuant to the Predetermined Protocol with the frequent provision of passive modalities. By contrast, in a legitimate clinical setting, as patients' abilities to perform active care increases, the use of passive

modalities should decrease. This does not occur in Defendants' treatment of patients. Further, despite the introduction of therapeutic exercises, the documentation continued to represent that patients have made no or minimal improvement with their documented conditions but continue to treat without meaningful alterations to the Predetermined Protocol.

### 6.    DME

149.    Another component to Defendants' protocol treatment, and their ability to recover the maximum amount of patients' available PIP Benefits, and, where applicable, MPC Benefits, is the prescription and dispensing of DME, with most patients receiving at least one piece of DME.

150.    The majority of patients received a transcutaneous electrical nerve stimulation ("TENS") unit. A significant portion of patients are also given a lumbar device, either a lumbar orthosis or lumbosacral device. These pieces of DME are almost always dispensed and billed on patients' initial visit to the Defendant clinics. **Exhibit B, Columns G, S and U – V**.

151.    The dispensing of TENS units to patients serves no therapeutic benefit to patients. To the contrary, this is redundant to the regular in-office administration of electric stimulation as part of the Predetermined Protocol.

152.    Further, a sizable portion of Defendants' patients are prescribed and dispensed a cervical traction device. While the TENS units and lumbar devices are most often provided to patient on their initial visit to the Defendant clinics, cervical traction devices are usually not dispensed until patients' eighth visit without any indication in the documentation that this DME was medically necessary. **Id., Columns G and T**. Utter has testified that patients typically receive the cervical traction device at this juncture in their care because they have undergone MRI testing, which, as noted above, generally occurs around the time of patients' seventh visit. Further, and much like the TENS units, patients receive no additional therapeutic benefit by using the cervical traction

device at home since they routinely were administered traction throughout their care as part of the Predetermined Protocol.

153.    The rote dispensing of DME across a diverse patient population, with each patient presenting with unique medical histories, injuries and treatment needs as described in this Complaint, is not credible and is fraudulent. Particularly egregious examples of the common patterns in the distribution of DME to patients evidenced by Defendants' Predetermined Protocol are seen in the records for patients who treated with the Defendant clinics following involvement in the same motor vehicle accident. For example, patients JB, a 12-year-old male, and YB, a 14-year-old female, sought treatment at PIP of Orange City on April 8, 2019 following a December 7, 2018 motor vehicle accident. Both minors were dispensed a TENS unit on their initial visit. On April 22, 2019, the fourth visit to PIP of Orange City for JB and YB, each was dispensed a cervical traction device. This example of dispensing expensive DME to minor patients was by no means isolated. Following a June 15, 2016 motor vehicle accident, JTM1, a 34-year-old male, and MM, an 8-year-old female, presented to Halifax on June 29, 2016 for treatment of their alleged injuries. Following examinations, both patients were dispensed a TENS unit on this visit date. JTM2, a 7-year-old male who was also involved in this motor vehicle accident, did not seek treatment until a week later, July 5, 2016. On JTM2's second visit to Halifax, July 6, 2016, he too was dispensed a TENS unit.

154.    Similarly, patients BS, a 67-year-old male, and HS, a 16-year-old female, sought treatment at Halifax following a June 24, 2016 motor vehicle accident. On the date of their initial visit, both patients were dispensed a TENS unit. When they returned to the clinic for care on August 8, 2016, which was BS's twenty-first visit and HS's eighteenth visit, each was dispensed a cervical traction device and a lumbar-sacral orthotic corset. This pattern in the coequal spread of time and

dispensing of DME is also illustrated by patients NH, a 51-year-old female, and TH, a 25-year-old female, who sought treatment with PIP of Orange City following a November 28, 2018 motor vehicle accident. On their initial December 10, 2018 visit to the clinic, both patients were dispensed a TENS unit and a sagittal control lumbar orthotic with rigid posterior and anterior panels. They returned for care on January 3, 2019, which was NH's tenth visit and TH's eleventh visit. At that time, the clinic dispensed a cervical traction device to both patients.

155.    It is highly improbable that the majority of patients seeking care for neck and/or back complaints would require orthotic devices to assist with their recovery, and equally improbable that these devices were required to be dispensed consistent with the timing evidenced at the Defendant clinics.

### 7.    Coverage is Exploited

156.    Defendants provide the foregoing treatment, if at all, pursuant to the Predetermined Protocol and to increase the total charges they can submit to State Farm Mutual and State Farm Fire to exploit their patients' PIP Benefits, and, where available, MPC Benefits, not because treatment is medically necessary to address the unique needs of each patient.

157.    To ensure Defendants could fully maximize their recovery against patients' available PIP and MPC benefits, and as outlined in paragraphs 60 to 160, Defendants guaranteed themselves access to the full value of their coverage ($10,000) by directing patients to medical providers who would render an opinion that Defendants' patients suffered an EMC.

158.    Ultimately, Defendants substantially depleted, or, in some instances, exhausted patients' PIP benefits as a matter of course. For example, from 2013 through early 2021, Defendants billed Plaintiffs an average of $7,962.79 per patient (across 875 patients). When expenses from other PIP providers involved in Defendants' patients care are also considered – in particular those expenses

incurred for medically unnecessary MRIs routinely ordered by Defendants as discussed above – the Predetermined Protocol succeeded in exhausting or nearly exhausting PIP benefits for most patients.

## I.     Plaintiffs' Justifiable Reliance

159.   Defendants submitted, or caused to be submitted, bills and supporting records falsely representing that Defendants provided services that were medically necessary, or that certain services were provided, when, in fact, they were provided (if at all) pursuant to the Predetermined Protocol and not to address the patients' unique circumstances and needs.

160.   State Farm Mutual and State Farm Fire are under statutory and contractual duties to promptly pay PIP and MPC Benefits for medically necessary services. The bills and supporting records Defendants submitted, or caused to be submitted, to Plaintiffs in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause Plaintiffs to justifiably rely on them.

161.   Defendants were obligated legally and ethically to act honestly and with integrity. Yet, Defendants have made material misrepresentations and have taken other affirmative acts to conceal their fraud from State Farm Mutual and State Farm Fire. Each bill and its supporting documentation, when viewed in isolation, do not reveal their fraudulent nature. Only when the bills and supporting records at issue are viewed together as a whole and over time do the patterns emerge revealing the fraudulent nature of all the bills and supporting records.

162.   As a result, State Farm Mutual and State Farm Fire have incurred damages of more than $3.3 million in benefits paid based on the fraudulent charges.

**COUNT I**
**COMMON LAW FRAUD**
**PLAINTIFF v. ALL DEFENDANTS**

163.    State Farm Mutual and State Farm Fire incorporate herein by reference the allegations set forth in paragraphs 1 through 162 of this Complaint.

164.    The misrepresentations, fraudulent conduct and other acts and omissions committed by Defendants constitute false and fraudulent representations as set forth in paragraphs 1 through 162, above. Such fraudulent representations include but are not limited to alleged physical complaints, examination findings, diagnoses, treatment plans, treatment rendered, and alleged reasonable and necessary treatment tailored to the needs of the individual insureds and all set forth Defendants' bills and supporting records which purport to be truthful and accurate when in fact they are false and misleading as detailed above.

165.    Defendants intentionally and knowingly made or caused to be made fraudulent statements of material fact to State Farm Mutual and State Farm Fire by submitting, or causing to be submitted, thousands of bills and related documentation for medically unnecessary services that were performed, if performed at all, not to address the unique medical needs of patients but to exploit the patients' PIP and MPC Benefits and enrich Defendants.

166.    The false statements of material fact include that (a) patients were legitimately examined to determine the true nature and extent of their injuries and to arrive at a legitimate treatment plan to address their true medical needs, when they were not; (b) patients were prescribed a course of treatment that was medically necessary, when they were not; (c) patients received a predetermined course of treatment consisting primarily of the same set of five passive modalities on almost every visit because it was medically necessary, when it was not; (d) patients underwent health and behavior assessments that were medically necessary and performed by a qualified health professional, when no such assessments were performed, and even if performed, they were not performed by a qualified professional; (e) patients received ultrasound services that were

supervised for the entirety of the administration of that modality, when in fact the treatment was not continuously supervised as required; (f) patients received spinal chiropractic manipulation and manual therapy and/or mechanical traction to separate areas of the body on the same visit, when, in fact, these modalities were each provided to treat the same body areas on the same visit; (g) patients were ordered to undergo medically unnecessary MRI testing but which in fact were ordered not because they were medically necessary, but instead were ordered to purportedly justify the continuation of the Predetermined Protocol; (h) patients were prescribed DME because it was medically necessary, when in fact the DME was dispensed pursuant to the Predetermined Protocol; and (i) at least from April 2020 forward, that the clinics were lawfully owned and operated by a licensed chiropractor, when they were not.

167.    Defendants intended that State Farm Mutual and State Farm Fire would be induced by such false and fraudulent representations to provide payment to Defendants for treatment allegedly provided to individuals making claims with State Farm Mutual and State Farm Fire for PIP Benefits, and, where available, MPC Benefits.

168.    State Farm Mutual and State Farm Fire justifiably relied on the fraudulent representations made by Defendants as described in this Complaint in making payments to Defendants.

169.    As a result of the false and fraudulent representations by Defendants, State Farm Mutual and State Farm Fire suffered injury as described throughout this Complaint.

170.    The harm Defendants have suffered is not limited to the individual fraudulent charges set forth in paragraphs 1 through 162, but extends to encompass all the charges which accompanied the fraudulent charges on each of the service dates in question set forth in this Complaint, and as illustrated in **Exhibit B** and the reimbursement Defendants issued on those charges. Accordingly,

State Farm Mutual and State Farm Fire are entitled to recover all monies paid on every bill where at least one fraudulent charge appeared.

WHEREFORE, Plaintiffs, State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company, demand that this Court enter judgment in their favor and against all Defendants, jointly and severally, for an amount exceeding $3.3 million plus any additional relief this Court finds just and equitable and warranted by applicable law.

## COUNT II
## FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
## PLAINTIFF v. ALL DEFENDANTS

171.    State Farm Mutual and State Farm Fire incorporate by reference the allegations set forth in paragraphs 1 through 162 of this Complaint.

172.    In each claim described in **Exhibits A, B and C**, Defendants engaged in unfair and deceptive acts and practices in the conduct of trade and commerce in violation of FDUTPA, § 501.211, *et seq.*, Fla. Stat.

173.    Defendants' unfair and deceptive practices include representing that:

a.      The services performed were medically necessary and lawfully rendered, as required by Florida's No-Fault Laws, when they were not;

b.      Patients were legitimately examined to determine the true nature and extent of their injuries, when they were not;

c.      Patients were legitimately diagnosed with, among other things, injuries of the cervical, thoracic and/or lumbar regions of the spine, when they were not;

d.      Patients underwent and were billed for health and behavior assessments performed by a qualified health professional, when no such services were provided and, even

if such services were provided, they were not provided by a qualified health professional;

e.   Patients received and were billed for services not rendered;

f.   Patients received treatment and were dispensed DME that were medically necessary, when in fact the treatment was performed and the DME was dispensed pursuant to the Predetermined Protocol; and

g.   The clinic Defendants, at least as of April 2020 forward, were lawfully owned, operated and controlled by a licensed chiropractor.

174.   Under Florida law, an "unfair or deceptive act" includes knowingly causing to be presented "to any insurer a false claim for payment." See § 626.9541(1)(u), Fla. Stat.

175.   Similarly, a person commits insurance fraud if that person "with the intent to injure, defraud, or deceive any insurer: (1) [p]resents or causes to be presented any written or oral statement as part of, or in support of, a claim for payment or other benefit pursuant to an insurance policy or a health maintenance organization subscriber or provider contract, knowing that such statement contains any false, incomplete, or misleading information concerning any fact or thing material to such claim." § 817.234(1)(a)1., Fla. Stat.

176.   Defendants violated § 626.9541 and § 817.234, Fla. Stat., each time they presented or caused to be presented charges for services that were not medically necessary and/or not lawful when they were rendered. Accordingly, every such instance of this conduct is *per se* unfair and deceptive under FDUTPA.

177.   Additionally, Defendants' above-described conduct also constitutes a traditional violation of FDUTPA. The conduct was deceptive in that it was likely to mislead a consumer acting reasonably under the circumstances to the consumer's detriment by representing that the charges

for treatment, DME and assessments were medically necessary and lawful when they were rendered.

178.    Fraudulent or knowingly false or misleading conduct on the part of a healthcare provider, such as Defendants, in the context of billing for PIP benefits constitutes a deceptive act and unfair trade practice pursuant to Florida's Deceptive and Unfair Trade Practices Act, § 501.211(4)(a), Fla. Stat.

179.    Further, Defendants' above-described conduct was unfair. The conduct was contrary to Florida public policy and was unconscionable and unscrupulous. This conduct produced no benefits to consumers or competition.

180.    As a result of Defendants' deceptive and unfair trade practices, Plaintiffs suffered actual damages, as it made payments to Defendants in excess of $3.3 million for fraudulent, unlawful or otherwise non-compensable medical services and equipment.

181.    Plaintiffs seek an award of attorney's fees pursuant to § 501.2105(1), Fla. Stat.

WHEREFORE, Plaintiffs request that this Court enter judgment in their favor and against Defendants, jointly and severally, for an amount in excess of $3.3 million for compensatory damages, attorney's fees and court costs associated with the prosecution of this action as permitted by § 501.211(2), Fla. Stat., plus any additional relief this Court finds just and equitable and warranted by applicable law.

**COUNT III**
**UNJUST ENRICHMENT**
**PLAINTIFF v. ALL DEFENDANTS**

182.    State Farm Mutual and State Farm Fire incorporate by reference the allegations set forth in paragraphs 1 through 162 of this Complaint.

183.    Defendants, through the billing submissions and supporting records from all the Defendant clinics, "knowingly," as defined in § 627.732(10), Fla. Stat., submitted false or misleading statements to State Farm Mutual and State Farm Fire relating to Defendants' claims and charges for medical services allegedly provided to the insureds.

184.    Pursuant to § 627.736(5)(b)1.c., those false or misleading statements invalidated the entirety of Defendants' billing for the medical services allegedly provided to the 728 patients set forth in **Exhibits A, B and C** hereto and relieved Plaintiffs of any and all requirement, duty, or obligation to pay any of the charges contained within those claims.

185.    Defendants' retention of amounts paid by State Farm Mutual and State Farm Fire was wrongful because these monies were obtained as a direct result of fraud and other wrongful acts set forth in this Complaint.

186.    State Farm Mutual and State Farm Fire have been harmed by Defendants' acts in wrongfully obtaining and retaining these monies, because Plaintiffs would not have paid Defendants' bills if they had known at the time they paid these claims that Defendants' acts were wrongful and fraudulent and were not compensable with insurance benefits or otherwise under § 627.736, Fla. Stat., the Policies, or the common-law.

187.    Defendants' retention of these payments violates fundamental principles of justice, equity and good conscience.

188.    Additionally, Defendants' retention of money received from State Farm Mutual and State Farm Fire due to Defendants' fraudulent and wrongful practices as described in this Complaint is wrong and unjust.

189.    State Farm Mutual and State Farm Fire have been harmed by Defendants' misrepresentations.

190.    Further, Dr. Utter received a direct benefit from the Defendant clinics' false or misleading billing practices and non-compensable medical services because each clinic is a pass-through entity for Dr. Utter, as owner of the clinics, and Dr. Utter received monetary distributions from each clinic for his participation in these practices.

WHEREFORE, Plaintiffs, State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company, demand that this Court enter judgment in their favor and against all Defendants, jointly and severally, for an amount exceeding $3.3 million plus any additional relief this Court finds just and equitable and warranted by applicable law.

**COUNT IV**
**DECLARATORY JUDGMENT**
**PLAINTIFF v. ALL DEFENDANTS**

191.    State Farm Mutual and State Farm Fire incorporate herein by reference the allegations set forth in paragraphs 1 through 162 of this Complaint.

192.    There is an actual controversy between Plaintiffs and Defendants relating to claims for the alleged services provided to insureds of State Farm Mutual and State Farm Fire. These claims are found in the form of the billing submissions and supporting documentation submitted by Defendants and which continue to be submitted by Defendants to State Farm Mutual and State Farm Fire.

193.    Defendants have and, it is anticipated, will continue to submit these billing submissions and supporting documentation on an ongoing basis and with the knowledge that they contain one or more of the material misrepresentations as more fully described herein.

194.    Defendants have no legal or equitable right to receive payment from State Farm Mutual or State Farm Fire for any bill submitted to State Farm Mutual or State Farm Fire which includes false, misleading, inaccurate and/or fabricated statements and misrepresentations.

WHEREFORE, State Farm Mutual and State Farm Fire demand this Court enter judgment in their favor pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that:

i.  State Farm Mutual and State Farm Fire have no legal or equitable obligation to issue reimbursement to Defendants on any outstanding or unpaid claims for payment based on any of Defendants' bills and supporting documentation submitted prior to the commencement of this action; and

ii.  State Farm Mutual and State Farm Fire have no legal or equitable obligation to issue reimbursement to Defendants for any bills and supporting documentation submitted subsequent to the filing of this action which include false, misleading, inaccurate, and/or fraudulent statements and representations.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company demand a trial by jury.

Dated: January 31, 2022

Respectfully submitted,

By: */s/ Nicholas J. Purvis*
NICHOLAS J. PURVIS
Fla. Bar No. 054268
nicholas.purvis@hklaw.com
DAVID I. SPECTOR
Fla. Bar No. 086540
david.spector@hklaw.com
HOLLAND & KNIGHT LLP
777 South Flagler Drive
Suite 1900, West Tower
West Palm Beach, Florida  33401
Telephone: (561) 833-2000
Facsimile: (561) 650-8399

and

MARC B. BAILKIN
PA Bar No. 82588
bailkin@bbs-law.com
EDWARD J. BRADLEY
PA Bar No. 73943
bradleye@bbs-law.com
JAMES T. MOUGHAN
PA Bar No. 33045
moughan@bbs-law.com
BENNETT, BRICKLIN &
SALTZBURG LLC
Centre Square, West Tower
1500 Market Street, 32nd Floor
Philadelphia, PA 19102

Pro hac vice (admission pending)